UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

'07 MAR -1 P 4 :19

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

Case No. 06-CR-56 (CNC)

ANGELA BISSONNETTE,

        Defendant.

## PLEA AGREEMENT

1.    The United States of America, by its attorneys, Steven M. Biskupic, United States Attorney for the Eastern District of Wisconsin, and Brian J. Resler, Assistant United States Attorney, and the defendant, Angela Bissonnette, individually and by attorney Jeffrey W. Jensen, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.    The defendant has been charged in one count of a one-count indictment which alleges a violation of Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(A), and Title 18, United States Code, Section 2.

3.    The defendant has read and fully understands the charge contained in the indictment and fully understands the nature and elements of the crime with which she has been charged and the charge and the terms and conditions of the plea agreement have been fully explained to her by her attorney.

4.     The defendant voluntarily agrees to plead guilty to the following count set forth in full as follows:

**THE GRAND JURY CHARGES:**

<u>**COUNT ONE**</u>

1.     Beginning in 2002 and continuing up to and including March 2, 2006, in the State and Eastern District of Wisconsin,

**KENYOUNTA HARVESTER,**
**CHANTEL LOCKETT a.k.a. CHANTEL HARVESTER,**
**LARRY HARVESTER,**
**ANGELA M. BISSONNETTE,**
**MARQUIS DAVIS,**
**JOSEPH JOHNSON,**
**NINA SIMMONS,**
**RAFAEL RODRIGUEZ,**
**RAUL AGUIRRE-ALVARADO a.k.a. PEDRO AGUIRRE-RAMOS,**

the defendants herein, knowingly and intentionally conspired with each other and with persons known and unknown to the grand jury to distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

2.     The offense involved 5 kilograms or more of a mixture and substance containing cocaine, a Schedule II controlled substance.

3.     The primary purpose of the conspiracy was to accumulate money, wealth and other assets, through the distribution of cocaine.

4.     As part of the conspiracy and in furtherance thereof:

a)     Certain conspirators purchased large quantities of cocaine from sources of supply inside and outside of the Eastern District of Wisconsin;

b)     Once obtained from sources, the cocaine was distributed to several "primary distributors" in Milwaukee;

c)     Some of the conspirators used various residences, to store, package and sell the cocaine;

2

d)   Some of the conspirators used various vehicles to transport cocaine to customers and to pick up money from customers;

e)   Some of the conspirators used cellular telephones to communicate with each other while conducting their drug trafficking activities; and

f)   Some of the conspirators used and carried firearms during and in relation to their drug trafficking activities.

All in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2.

5.   The defendant acknowledges, understands, and agrees that she is, in fact, guilty of the offense described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts detailed in Attachment "A" beyond a reasonable doubt. The defendant admits to these facts and that these facts establish her guilt beyond a reasonable doubt.   The information in Attachment "A" is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of or participation in this offense.

## PENALTIES

6.   The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine: life imprisonment and $4,000,000. The count also carries a mandatory minimum of 10 years of imprisonment. The count further carries a mandatory special assessment of $100, and at least 5 years of supervised release.

7.   The defendant acknowledges, understands, and agrees that she has discussed the relevant statutes as well as the applicable sentencing guidelines with her attorney.

3

## PROOF OF DRUG WEIGHT FOR STATUTORY MAXIMUM PENALTY

8.     The parties understand and agree that for the penalties in 21 U.S.C. § 841(b)(1)(A)(ii)

to apply, as provided in paragraph 6 above, the government must prove beyond a reasonable doubt

that the offense to which the defendant is pleading guilty involved at least 5 kilograms of cocaine.

The defendant agrees that the government possesses sufficient, admissible evidence to meet this

burden.

## ELEMENTS

9.     The parties understand and agree that in order to sustain the charge of Conspiracy to

Distribute 5 Kilograms or More of Cocaine as set forth in Count One, the government must prove

each of the following propositions beyond a reasonable doubt:

First, that the conspiracy, as charged in Count One, existed;

Second, that the defendant knowingly and intentionally became a member of the conspiracy
with the intent to further the conspiracy.

## SENTENCING PROVISIONS

10.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the

presentence report, including that the presentence report be disclosed not less than 35 days before

the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be

established by the court at the change of plea hearing.

11.     The parties acknowledge, understand, and agree that any sentence imposed by the

court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the

Sentencing Guidelines when sentencing the defendant.

4

12.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth in paragraph 4. The defendant acknowledges and agrees that her attorney in turn has discussed the applicable sentencing guidelines provisions with her to the defendant's satisfaction.

13.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of defendant's criminal history.

## Sentencing Guidelines Calculations

14.     The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the

5

sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which defendant is pleading guilty.

16.      The parties acknowledge, understand and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge will consider not only the weight of the drugs alleged in the offenses to which the defendant is pleading guilty, but also the weight of any additional drugs that were involved as part of the same course of conduct or common scheme or plan as the offenses of conviction; and the judge will use the total weight of the drugs involved in calculating the sentencing guidelines range, even if not alleged in the offense of conviction. For purposes of determining the defendant's base offense level under the guidelines, the parties agree to recommend to the sentencing court that, based on evidence available to the government and admissible against the defendant, the government is able to establish by a preponderance of the evidence that the drug quantity attributable to the defendant is at least 50 kilograms of cocaine.

**Base Offense Level**

17.      The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count One is 36 under Sentencing Guidelines Manual § 2D1.1(c)(2).

**Specific Offense Characteristics**

18.      The parties agree to recommend no adjustment for any specific offense characteristic is applicable to the offense level for the offense charged in Count One.

**Role in the Offense**

19.      Pursuant to Sentencing Guidelines Manual § 3B1.1 and 3B1.2, the parties agree to recommend to the sentencing court that no adjustment be given for an aggravating or mitigating role

6

in the offense, as the defendant was neither an organizer, leader, manager or supervisor, nor a minimal or minor participant.

## Acceptance of Responsibility

20.     The government agrees to recommend a  two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

21.     Both parties reserve the right to apprise the district court and the probation office of any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

22.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

23.     The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the court.

7

## Court's Determinations at Sentencing

24.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

25.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

26.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

27.     The defendant agrees that, during the period of any supervision (probation or supervised release) imposed by the court in this case, the defendant will provide the Financial Litigation Unit (FLU) of the United States Attorney's Office with completed financial forms which will be provided by FLU, and will provide any documentation required by those forms. The defendant will provide FLU with such completed financial forms with required documentation within the first two months of supervision, at six month intervals thereafter during supervision, and within the last six months of scheduled supervision.

8

## Special Assessment

28.     The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

## Forfeiture

29.     The defendant agrees that all properties listed in the indictment information and/or bill of particulars constitute the proceeds of the offense to which she is pleading guilty, or were used to facilitate such offense.  The defendant agrees to the forfeiture of these properties and to the immediate entry of a preliminary order of forfeiture.  The defendant agrees that she has an interest in each of the listed properties.  The parties acknowledge and understand that the government reserves the right to proceed against assets not identified in this agreement.

## DEFENDANT'S COOPERATION

30.     The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The government agrees to advise the sentencing judge of the nature and extent of the defendant's cooperation.   The parties acknowledge, understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from: (a) the applicable sentencing guideline range; (b) any applicable statutory mandatory minimum; or (c) both.  The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

9

## DEFENDANT'S WAIVER OF RIGHTS

31.     In entering this agreement, the defendant acknowledges and understands that in so

doing she surrenders any claims she may have raised in any pretrial motion, as well as certain rights

which include the following:

a.     If the defendant persisted in a plea of not guilty to the charges against her, she would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b.     If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and her attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.     At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and she would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on her own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.     At such trial, defendant would have a privilege against self-incrimination so that she could decline to testify and no inference of guilt could be drawn from her refusal to testify. If defendant desired to do so, she could testify on her own behalf.

10

32.     The defendant acknowledges and understands that by pleading guilty she is waiving all the rights set forth above. The defendant further acknowledges the fact that her attorney has explained these rights to her and the consequences of her waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

33.     The defendant acknowledges and understands that she will be adjudicated guilty of each offense to which she will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

34.     The defendant knowingly and voluntarily waives all claims she may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

35.     Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives her right to appeal her sentence in this case and further waives her right to challenge her conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the

11

sentencing court's reliance on any constitutionally impermissible factor, and (3) ineffective assistance of counsel.

### Further Civil or Administrative Action

36.     The defendant acknowledges, understands, and agrees that the defendant has discussed with her attorney and understands that nothing contained in this agreement, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

### GENERAL MATTERS

37.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

38.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

39.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

40.     The defendant understands that pursuant to the Victim and Witness Protection Act and the regulations promulgated under the Act by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant

12

acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## **EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT**

41.     The defendant acknowledges and understands if she violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of her breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that she continues to be subject to the terms of the proffer letter.

## **VOLUNTARINESS OF DEFENDANT'S PLEA**

42.     The defendant acknowledges, understands, and agrees that she will plead guilty freely and voluntarily because she is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

13

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 2 - 25. 07

ANGELA BISSONNETTE
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 2-28-07

JEFFREY W. JENSEN
Attorney for Defendant

For the United States of America:

Date: 2/1/07

STEVEN M. BISKUPIC
United States Attorney

Date: 2/

BRIAN J. RESLER
Assistant United States Attorney

14

**Plea Agreement: United States v. Kenyounta Harvester, et al. 06-CR-56 (CNC)**

## A.    Summary of Investigation

1.      In September 2004, agents and officers from HIDTA, the Milwaukee Police Department (MPD), the United States Department of Justice, Drug Enforcement Administration (DEA), and the Wisconsin Department of Justice, Division of Criminal Investigation (DCI), began to investigate the drug trafficking activities of **Kenyounta Harvester** and his associates in the Milwaukee area. During the investigation, the agents received detailed information about this organization from at least ten confidential informants, and received additional information through interviews of citizens, interaction with other law enforcement agencies, surveillance, and telephone, property, vehicle, criminal and other records. In addition, during this investigation, agents seized physical evidence including cocaine, marijuana, firearms, U.S. currency and jewelry.

2.      **Harvester** and his associates utilized cellular telephones to further the ends of the conspiracy. Pursuant to orders of District Court Judge Lynn S. Adelman on January 30 and March 1, 2006, agents intercepted wire communications over a cellular telephone utilized by **Kenyounta Harvester** from January 31, 2006, to March 2, 2006. The information obtained through the wiretap confirmed and corroborated the existence and operation of the conspiracy.

3.      On March 2, 2006, the defendants in this case, with the exception of **Kenyounta Harvester**, were arrested and charged by criminal complaint. On March 14, 2006, **Kenyounta Harvester, Chantel Lockett, Larry Harvester, Angela Bissonnette, Marquis Davis, Joseph Johnson, Nina Simmons, Rafael Rodriguez** and **Raul Aguirre-Alvarado** were charged in a single-count indictment with Conspiracy to Distribute 5 Kilograms or More of Cocaine, 50 Grams or More of Cocaine Base and Marijuana. **Kenyounta Harvester** was arrested in Milwaukee on March 17, 2006. Subsequent to their arrests, each of these defendants debriefed with agents pursuant to standard proffer letters regarding the operations of the conspiracy.

4.      In addition, on August 22, 2006, eight other defendants, including **Christopher Paskel, Anthony Yateman, Gary Kirksey, Derrick Bohannon, Toya Olds, Michelle Mays, Terrill Crawford,** and **Chazmar Spivey** were charged with participation in this conspiracy in case 06-CR-207 (RTR). An additional defendant, **Daidra Brown**, was charged with maintaining a drug-involved premises. Subsequent to their arrests, several of these defendants debriefed with agents pursuant to standard proffer letters regarding the operations of the conspiracy.

5.      Had this case proceeded to trial, the United States would have produced testimony and other evidence to establish beyond a reasonable doubt that beginning in 2002 and continuing until at least March 2, 2006, in the State and Eastern District of Wisconsin and elsewhere, **Kenyounta Harvester, Chantel Lockett a.k.a. Chantel Harvester, Larry Harvester, Angela**

1

**Bissonnette, Marquis Davis, Joseph Johnson, Nina Simmons, Rafael Rodriguez** and **Raul Aguirre-Alvarado, a.k.a. Pedro Aguirre-Alvarado**, knowingly and intentionally conspired with each other and others to distribute cocaine, cocaine base and marijuana in and around the State and Eastern District of Wisconsin. Further, that during the conspiracy, the members collectively distributed well in excess of 5 kilograms of a mixture and substance containing cocaine and well in excess of 50 grams of cocaine base, both Schedule II controlled substances.

## B. Evidence Obtained From Confidential Informants

6. Confidential Informant 1 ("CI-1") cooperated based upon a State prosecution, and has an extensive criminal record. CI-1 related the following information. Beginning in 2002 and continuing through the summer of 2004, **Kenyounta Harvester** supplied CI-1 with 2-4 kilograms of cocaine per week. During that time, **Harvester** purchased approximately 15 kilograms of cocaine per week and varied amounts of marijuana ranging from 50 to several hundred pounds per week. **Harvester** sold all 15 kilograms for around double their wholesale price. **Chantel Lockett a.k.a. Chantel Harvester, Kenyounta Harvester's** wife, possessed various assets purchased with proceeds from drug trafficking, including a BMW X5 sport-utility vehicle and a large diamond wedding/engagement ring. **Angela Bissonnette**, held cocaine and marijuana for **Kenyounta Harvester**. **Larry Harvester** is **Kenyounta's** younger brother and delivered drugs at the direction of **Kenyounta Harvester**. When conducting drug deals with customers, **Kenyounta Harvester** would often call **Nina Simmons**, who then drove over to **Harvester's** location in a rental car to drop off drugs. **Harvester** would then hold everyone in place for 30 minutes to an hour so that no one could follow **Simmons** and learn where the drugs were stored.

7. CI-2 related the following information. CI-2 has observed **Anthony Yateman** and **Christopher Paskel** being supplied with cocaine by **Kenyounta Harvester**, whom CI-2 has observed with a .40 caliber pistol. CI-2 further knew that **Joseph Johnson** sometimes delivered the drugs to **Yateman** for **Harvester**.

8. CI-3 is an illegal immigrant. DEA has intervened on CI-3's behalf with the Bureau of Immigration and Customs Enforcement to obtain temporary legal status for CI-3 so that CI-3 could continue to assist law enforcement. CI-3 was also paid by law enforcement personnel for his cooperation. CI-3 related the following information.

        a.      CI-3 worked as a distributor for a cocaine supplier to the **Harvester** conspiracy named Edgar D. Juarez, aka "Danny." CI-3 first met **Harvester** in Milwaukee in 2003 through "Danny." "Danny" was murdered in Chicago in 2003 in a triple-murder, which appears to be related to "Danny's" narcotics trafficking.

        b.      On August 7, 2003, Chicago HIDTA agents brought CI-3 to Milwaukee, Wisconsin, where CI-3 collected $10,000 in drug debt from **Harvester**. CI-3

2

discussed the death of "Danny" and **Harvester** said he would now need a new supplier of cocaine. CI-3 advised that CI-3 could introduce **Harvester** to a new supplier in the near future. On August 19, 2003, HIDTA agents arranged for CI-3 and an undercover agent posing as a drug dealer to meet with **Harvester** in Skokie, Illinois. **Harvester** arrived for the meeting in a vehicle bearing Wisconsin plates 222FEC, driven by an unknown female. A records check of the license plate showed it listed to **Nina Simmons**, 6747 N. 75th Street, Milwaukee, WI. **Harvester** was upset by the way the undercover officer acted and told CI-3 that he wanted to shoot the undercover officer outside in the parking lot. Further negotiations were conducted via telephone in August, 2003, for the purpose of arranging a "reversal" whereby **Harvester** was to bring money for a purchase of 30 kilograms of cocaine. Two telephone numbers used by **Harvester** had listed subscribers of Elenzo Harvester and **Chantel Lockett**.

c.    On October 14, 2003, HIDTA agents received information from CI-3 that **Kenyounta Harvester** had obtained a new source of cocaine and marijuana named "Pedro." CI-3 informed agents that CI-3 had previously provided **Harvester** with a trap vehicle, i.e., a vehicle with a hidden compartment. **Harvester** expressed interest in purchasing traps for additional vehicles as well as for a barbershop. Shortly, thereafter, the Chicago investigation was closed.

d.    During 2003, CI-3 made about 20 trips to Milwaukee, of which four were to deliver cocaine. The deliveries were for 10, 30, 20, and 25 kilograms, respectively (85 kilograms total). The others were to collect money or to meet with **Harvester**. **Harvester** generally paid about $18,000 to Danny for each kilogram of cocaine. CI-3 recalls receiving a minimum of $1,000,000 from **Harvester** in payment for the cocaine.

e.    CI-3 also installed trap compartments in two automobiles for **Harvester**. One vehicle was a Chevrolet Monte Carlo (seized by Milwaukee Police on April 20, 2004); the other was a Ford Taurus. **Harvester** called CI-3 up to Milwaukee once to fix the trap in the Taurus when it got stuck. **Harvester** had a .40 caliber pistol inside the trap when CI-3 repaired it. CI-3 also built a space for **Harvester** to store a watch in the trap. **Harvester** showed CI-3 a diamond-encrusted watch, for which **Harvester** said he paid $80,000 or $90,000.

f.    In 2003, CI-3 visited a house maintained by **Harvester** at 7024/7026 W. Acacia Street; an apartment at Silver Spring and Fond Du Lac Avenues; and two barber-shops, including Marell's. The utilities listed at the residence located at 7026 were in the name of **Angela Bissonette**. When CI-3 traveled

3

to Milwaukee to pick up money, it was always to **Harvester's** apartment at Silver Spring at Fond Du Lac Avenues. When CI-3 arrived to pick up the money, **Harvester** would not have the money at the apartment. **Harvester** would call **Angela Bissonnette**, who would bring the money over. CI-3 noted only one occasion where **Harvester** had the money – about $280,000 – at the apartment.

9. CI-4 is cooperating based upon a State prosecution, and related the following information. CI-4 first met **Kenyounta Harvester** three to four years ago. **Harvester** supplied CI-4 with cocaine on approximately four occasions in 2002 and 2003, including one purchase of one kilogram of cocaine for $23,000, and three separate purchases of nine ounces (1/4 kilogram) of cocaine for $5,800 each. CI-4 would meet **Harvester** and negotiate a sale price for the cocaine, then **Harvester** would then make a telephone call, and CI-4 would meet a female to complete the deal. After CI-4 gave the female the money, she would leave and return with the cocaine. CI-4 said that the female would be followed by another vehicle that appeared to be watching her. CI-4 further stated that **Harvester** bragged about being worth millions of dollars and owning jewelry and property, including in Atlanta, Georgia.

10. CI-5 is serving a prison sentence, and related the following information. CI-5 supplied a total of 17 to 20 kilograms of cocaine at an average price of $21,500 to $22,000 per kilogram to **Kenyounta Harvester** starting around August-September 2002 and continuing to July 2003. CI-5 supplied approximately 12 kilograms of cocaine every two weeks, with the largest single purchase being 3 kilograms. These deliveries typically took place at a parking lot near S. 35th Street & W. National Avenue in Milwaukee.

11. CI-6 is cooperating based upon a State prosecution, and related the following information. In March 2003, **Kenyounta Harvester** supplied CI-6 with an ½ ounce quantity of crack cocaine for $375. Less than a week later, **Harvester** supplied CI-6 with a full ounce for $700. In April 2003, **Harvester** supplied CI-6 with 4 ½ ounces of crack cocaine for $2,850, which CI-6 said was a good price at the time. CI-6 then continued to purchase 4 ½ ounce quantities of crack cocaine at least once a week, but usually twice per week. After one month, **Harvester** raised the price for each 4 ½ ounce quantity to $3,400. From April 2003 though 2005, **Harvester** supplied CI-6 with "at least 30" 4 ½ ounce quantities of crack cocaine.

12. CI-7 is cooperating based upon a State prosecution, and related the following information.

      a.   CI-7 met **Kenyounta Harvester** in 2003, through **Anthony Yateman a.k.a. Anthony Robinson**. CI-7 was stopped in another state during a drug run for another organization, and the police seized $53,000 from CI-7's vehicle. When CI-7 returned to Wisconsin, CI-7 called **Harvester** and met him at a house N. 86th Street and W. Good Hope Road. **Larry Harvester** patted CI-7 down, telling CI-7 that he did not care if CI-7 had any pistols, but wanted to

4

make sure that CI-7 was not wearing a wire. CI-7 told **Harvester** about the seizure, and he replied, "you could have bought five birds [kilograms] for that much money." **Harvester** then said to someone, "bring a movie" [a kilogram]. **Angela Bissonnette** then brought a kilogram of cocaine. CI-7 believes this display was meant to demonstrate how easy **Kenyounta Harvester** could supply CI-7.

b.    On three occasions, **Anthony Yateman** supplied CI-7 with 4 ½ ounces of cocaine for $2,700. CI-7 also observed **Yateman** supply "Rich Buck" (**Calvin Hayes**) with nine ounces of cocaine. **Kenyounta Harvester** supplied CI-7 with cocaine on a consignment basis on several occasions through **Yateman**. When CI-7 paid **Harvester** for the drugs fronted to CI-7, **Harvester** would immediately push an additional amount of cocaine on CI-7 to keep CI-7 in debt so CI-7 would keep dealing with him. For example, **Yateman** supplied CI-7 with 4 ½ ounce quantities of cocaine on five occasions, so CI-7 then owed **Yateman** $11,000. After CI-7 paid $9,000, **Yateman** supplied CI-7 with a half-kilogram of cocaine for $11,000. After a while, **Harvester** called CI-7 directly and said CI-7 did not have to go through **Yateman** anymore. In late September or October 2003, **Harvester** supplied CI-7 with a half-kilogram of cocaine for $11,000, and **Yateman** was angry that **Harvester** had cut him out of the transaction. From September 2004 until start of summer 2005, **Harvester** then supplied CI-7 about one kilogram of cocaine every two weeks and CI-7 estimated that **Harvester** supplied CI-7 with more than ten kilograms of cocaine.

c.    CI-7 has seen **Kenyounta Harvester** with approximately $1,000,000 in cash. CI-7 helped **Harvester**, **Anthony Yateman** and others in a money counting session that lasted all night at **Yateman's** house. CI-7 knew that **Harvester** used several locations for drug dealing activities, including apartments or houses on N. Presidio Lane; N. 86th Street and W. Good Hope Road; N. 85th Street and W. Capitol Drive; and N. Servite Drive behind a Menard's store.

13.    CI-8 is cooperating based upon a federal prosecution, and relayed the following information. CI-1 supplied CI-8 with cocaine, usually 4.5 to 6 ounces of cocaine at a time. CI-8 also bought two ounces of cocaine base from Judale Malone, who said he received it from **Kenyounta Harvester**. **Harvester** supplied CI-1 at least through September 2004, selling CI-1 between ½ kilogram to one kilogram of cocaine per week. On average, **Harvester** supplied C1-1 with five kilograms per month from 2002 through 2004. CI-1 started out selling 4-5 kilos of cocaine a month, just to impress **Harvester**. CI-1 then started personally selling 1-2 kilos per month, which he would mix with a cutting agent to make more money. CI-8 occasionally helped CI-1 distribute **Harvester's** cocaine and received a small amount of CI-1's profit. CI-8 spoke to **Harvester** on the phone on one occasion, when **Harvester** was upset with CI-1. **Harvester** asked about selling directly to CI-8,

5

without CI-1 as the middleman. However, because CI-1 got back in **Harvester's** good graces, no direct transactions ever took place.

14.    CI-10 is cooperating based upon a federal prosecution, and relayed the following information. CI-10 first met **Kenyounta Harvester** in 2001, and did 3-4 drug transactions with him; each deal for between 4 ½ to 9 ounces of powder cocaine. CI-10 met up with **Harvester** again in the fall of 2004. CI-10 purchased an ounce of cocaine from **Harvester**, took it home and cooked it into crack cocaine, and then promptly ordered an additional ½ kilogram of cocaine. CI-10 conducted three additional purchases directly from **Harvester**, each for a kilogram of cocaine. **Harvester** ultimately supplied CI-10 with seven additional kilograms between November 2004 and January 2005. On each of these occasions, CI-10 called **Harvester**, who then directed CI-10 to pick up the cocaine from Brandon Bennett at an apartment building in the area of N. 92nd Street and W. Monrovia.    During surveillance in 2005 and 2006, agents observed vehicles associated with **Harvester** making brief stops at this location. **Harvester** once showed CI-10 a Jacobs watch encrusted with diamonds, and bragged that the watch cost more than $100,000. Agents subsequently seized this watch from 7456 N. 86th Street. It has been appraised at a value of $140,000 **Harvester** always carried a handgun during meetings, and was excessively security conscious. **Harvester** told CI-10 that he employed private detectives to do checks on people to ensure that he would not get robbed or set up by the police.

## C.    **Evidence Obtained Through Traditional Investigation**

15.    On April 5, 2004, **Angela Bissonnette** was arrested on state charges of possession with intent to deliver marijuana and keeping a drug house. Officers conducted a consent search of the house, located at 7456 N. 86th Street, and recovered over 77 pounds of marijuana, a loaded .40 caliber pistol, $975 in cash, a vacuum sealer and bags, two cellular phones, a digital scale, security cameras, personal papers in the name of **Kenyounta Harvester** and **Angela Bissonnette**, **Kenyounta Harvester's** Wisconsin State I.D. card and Bank One Visa card, **Kenyounta Harvester's** business cards ("Kenny Fly" and a blank line next to the "cell #"), a diamond encrusted Jacobs men's watch worth $140,000, and photographs. **Bissonnette** waived her rights and made a statement admitting possession of the marijuana and claiming that she had purchased the .40 caliber pistol from a gun show. **Bissonnette** also admitted buying two other firearms from a gun store in Milwaukee County, but claimed that these firearms had been stolen, though she never reported the theft of these firearms to the police.

16.    After her arrest, **Bissonnette** was held in the Milwaukee County Jail. **Bissonnette** made a telephone call to **Chantel Lockett**, Harvester's wife, which was recorded as a matter of course. During the call, **Kenyounta Harvester** got on the line and spoke with **Bissonnette**. **Bissonnette** apologized to **Harvester** for the incident, admitted that she gave consent to the police, and assured him that she had not told the police anything about the "family tree." **Harvester** complimented **Bissonnette** by describing her conduct as "gangsta" and assured **Bissonnette** that he

6

would take care of her, even if it costs "50,000." **Bissonnette** subsequently pled guilty to a charge of keeping of a drug house.

17.     On April 5, 2004, City of Milwaukee police received consent to search 8573 N. 106th Street, from **Chantel Lockett**, who claimed she lived at the residence. Inside, officers recovered $41,844, a small quantity of marijuana, nine .45 caliber cartridges, a bullet proof vest, a cellular telephone, utility bills for the house and tax records in the name of **Chantell Lockett**, and records that indicated that "**Chantel Lockett**" paid rent for 7251 W. Appleton Avenue. During the same recorded jail conversation with **Bissonnette** referenced above, **Chantel Lockett** indicated that the police had taken $40,000 from their apartment on 106th Street.

18.     On April 20, 2004, **Kenyounta Harvester** was arrested during a traffic stop in front of 8541 N. 106th Street for possession of a firearm by a felon. **Harvester** was wearing a men's watch worth over $25,000, and was the sole occupant of a black Monte Carlo. During the search incident to arrest, officers discovered that the passenger side air bag had been removed and replaced by a mechanically operated trap compartment. As noted above, this compartment was installed by CI-3. The case was dismissed following federal charges.

19.     On May 25, 2004, Kevin Johnson – brother of **Joseph Johnson** – and an unindicted member of the conspiracy was arrested on a State charge of possession with intent to deliver cocaine base (less than 15 grams). He pled guilty on October 5, 2005. On February 16, 2006, he was sentenced to 15 years prison.

20.     On December 17, 2004, Kevin Johnson was arrested during a traffic stop on state charges of possession with the intent to deliver cocaine base, possession of a firearm by a felon, and bail jumping. Johnson was driving the same vehicle – a Ford Bronco – that officers had attempted to follow on October 18, 2004 (but it consciously evaded them). Officers searched the vehicle and located an electrically activated trap compartment inside the steering wheel. Secreted in the compartment was a loaded Glock .40 caliber pistol, two 1/8-ounce quantities of crack cocaine, almost $3,000, and a black knit hat. Johnson had three cellular telephones. After the arrest, an officer observed that one of Johnson's phones received an incoming text message from "Drawzz (Nathaniel Johnson) informing Kevin Johnson that "Fly [**Kenyounta Harvester**] says chirp him" (meaning that Johnson should use the "walkie-talkie" or direct-connect feature of the cell phone to contact **Harvester**).

21.     While Kevin Johnson was in-custody at the Milwaukee County Jail, MPD detectives reviewed a recorded telephone call between Johnson and **Kenyounta Harvester**, during which they discussed the contents of the steering wheel trap compartment. Johnson told **Harvester** that he was in the middle of making money pick-ups when the police stopped him. MPD detectives also monitored a call in which Johnson said that he had the $30,000 necessary to bail himself out, but was concerned it would be seized by the police because it was dirty money.

7

22.     On February 28, 2005, officers from the Brown Deer Police Department investigated a fire in an apartment building located at 8250 N. 46th St., Apt. 106, Brown Deer, Wisconsin. Investigators discovered that the fire apparently was accidentally started while one or more persons were processing cocaine. Officers recovered two glass baking trays: one contained a rectangular brick of cocaine weighing approximately 1.5 pounds; the other contained a few ounces of cocaine that appeared to be peanut sized chips broken off of another brick of cocaine. Officers also recovered other smaller amounts of cocaine, and numerous other items indicative of drug trafficking, including mixing bowls with cocaine residue, a metal press, large jugs of Acetone, vacuum packaging plastic roll, bottles of Inositol powder, drug packaging materials, and a loaded Glock .45 caliber pistol. According to an ATF trace report, **Angela Bissonnette** originally purchased this gun from Badger Guns & Ammo in Milwaukee County. The building's management had records showing that a Bettye A. Berry rented this apartment. Berry is the mother of Bridgett Groshek, who is known to be the aunt of **Nina Simmons**.

23.     On March 3, 2005, MPD detectives observed **Nina Simmons** and Bridget Groshek leaving 8250 N. 93rd Street, one of numerous properties rented in **Simmons's** name and believed to be used for drug trafficking activities. MPD detectives arrested **Simmons** for obstructing an officer and driving with a suspended driver's license. MPD detectives further confiscated $2,912 cash from **Simmons**, who had no explanation for the money. **Simmons** had two cell phones, including a cell phone with a number known to be used by **Kenyounta Harvester** at the time, (414) 737-2618, as well as a cell phone with no phone book or names, only unlabeled direct-connect numbers. Simmons denied coming out of 8250 N. 93rd Street, and denied knowing **Harvester**, although she had a tattoo, "Ken," on her arm. After her arrest, **Simmons** moved and changed telephone numbers.

24.     On June 7, 2005, detectives learned that an automobile driven by **Nina Simmons** at the time of her arrest on March 3, 2005, had received parking citations at, and was eventually towed from, the AmeriSuites Hotel, 11777 W. Silver Spring Drive. Detectives went to the hotel and learned that the management suspected that **Angela Bissonnette** was using a hotel room to conduct drug transactions. **Bissonnette** had originally checked-in on April 12, 2005, and was paying $75 cash per day with no specified checkout date. **Bissonnette** had already paid over $4,000 in cash to the hotel. **Bissonnette** was also receiving numerous outside calls that were connected through the hotel's operator. Hotel employees identified **Bissonnette** and **Kenyounta Harvester**, who was a frequent visitor, through photgraphs. An employee further suspected **Harvester** was also involved in drug activity because of conversations he/she overheard as **Harvester** was speaking on his cell phone in the lobby area.

25.     On June 9, 2005, detectives learned that **Chantel Lockett** had rented a green Toyota Camry with Wisconsin license plate WNW318. On June 11, 2005, detectives initiated surveillance of the AmeriSuites hotel. Agents observed that a rented Dodge Durango was still parked at the hotel, and had previously observed **Bissonnette** make two trips in the vehicle from the hotel to **Harvester's** home address in Brookfield, Wisconsin. Detectives also observed **Harvester** driving the Toyota Camry rented by **Lockett** to the hotel. Another woman, Joy Thomas, was also observed driving a Mercury Villager minivan belonging to **Chantel Lockett** to and from the hotel. Detectives

8

unsuccessfully attempted to follow **Harvester** when he left the hotel on this date, but were unable to do so safely as **Harvester** was speeding, driving erratically, and engaging in counter surveillance maneuvers.

26. On July 11, 2005, detectives arrested **Joseph Johnson** and **Marquis Davis** during a traffic stop for carrying concealed weapons. **Johnson** and **Davis** each had a loaded firearm in their pants pockets, and detectives further recovered $2,800 from them. During surveillance prior to the arrest, agents observed the vehicle briefly stop, and **Johnson** and **Davis** exit, in the 2600 block of N. 17th Street. On July 12, 2005, CI-2 advised detectives that **Johnson** and **Davis** had delivered a 4.5 ounce quantity of cocaine powder to Victor Thomas in the area of N. 17th and W. Center Streets, just prior to being arrested with guns.

27. On September 30, 2005, CI-3 agreed to attempt to re-establish a relationship with **Kenyounta Harvester**. Under audio and video surveillance of case agents, CI-3 entered **Harvester's** barbershop (Marell's), wearing a recording device. CI-3 eventually met **Harvester** at N. 76th Street and W. Mill Road. **Harvester** had two black males with him who appeared to stand guard while **Harvester** spoke with CI-3 about his prior relationship with CI-3 and their mutual relationship with "Danny" (the murdered former cocaine supplier from Chicago). **Harvester** said that police had seized his black car (the Monte Carlo) because they found the "stash" (trap compartment). **Harvester** added that he had a lot of work for CI-3 to do, including putting "stashes" in five cars. **Harvester** also stated that his birthday was the previous day and showed a watch he claimed was a $52,000 Rolex. **Harvester** said he needed "stashes" put in three cars right away, and said he would call CI-3 in about a week. **Harvester** added that he needed that "stash" for a gun and "stuff", and wanted a "stash" put into a Yukon that would hold 30-40 kilograms of cocaine. The entire meeting was captured by the recording device.

28. On November 1, 2005, **Kenyounta Harvester** and CI-3 met and talked at length about installing traps in **Harvester's** vehicles, specifically discussing placing traps in a Dodge minivan and Chevrolet Tahoe. **Harvester** and two of his associates were armed with handguns.

29. On January 31, 2006, Indiana State Police stopped an overdue rental car in which Brandon Bennett, **Marquis Davis**, **Joseph Johnson**, Ken Glenn, and an unidentified fifth passenger were driving. Bennett was arrested for operating without a license; **Davis** was arrested for possession of marijuana. Indiana State Police subsequently obtained consent from the rental car company, conducted a search of the vehicle and found two firearms.

30. On March 2, 2006, officers and agents stopped and arrested **Rafael Rodriguez** and **Raul Aguirre-Alvarado** after they met with **Kenyounta Harvester** at **Nina Simmons's** residence at 6580 North 73rd Street. During the meeting, **Harvester** gave them in excess of $200,000 as payment for cocaine previously received on consignment. A subsequent search of **Rodriguez** and **Aguirre-Alvarado's** vehicle uncovered over $200,000 in cash secreted in a trap compartment in the front driver's side dash board.

9

31.     Around the same time, agents saw the conspiracy's white Dodge Caravan, which was regularly used for drug deliveries and money pick-ups, parked in the area of 74th and Acadia. **Nina Simmons** was also observed driving into the area of 74th Street and Acadia and parking her Tahoe next to the Caravan. **Joe Johnson** got out of the Caravan and into **Simmons'** Tahoe. Approximately 15-20 seconds later, **Johnson** emerged from the Tahoe with a bag and got back into the Caravan. **Simmons** then drove westbound, while the Caravan headed north on 74th Street. Officers then attempted a traffic stop of the Caravan at approximately 60th Street and Silver Spring. After a short pursuit, **Johnson** fled from the Caravan on foot. Agents in pursuit of **Johnson** observed him jump a fence and throw down what was later found to be two kilograms of powder cocaine. The cocaine was packaged in plastic bags with blue tape that was consistent with what agents observed **Nina Simmons** purchase from Wal-Mart on the evening of March 1, 2006. Police further seized a diamond encrusted dog-tag from **Johnson**, and also arrested the driver of the minivan, **Marquis Davis**.

32.     Agents located **Nina Simmons'** Tahoe driving on N. 76th Street. After a pursuit that involved approximately 12 police cars and lasted over 5 minutes, **Simmons** eventually pulled the Tahoe into a gas station located at N. 76th Street and W. Bradley Road. **Simmons** and **Larry Harvester**, who was the only passenger, were arrested. Officers seized a high-end diamond cross and diamond earrings from **Larry Harvester** and a Jacobs watch and diamond ring from **Simmons**.

33.     Agents then went to 16755 Dane Court in Brookfield, Wisconsin, the home of **Kenyounta Harvester** and **Chantel Lockett**. **Lockett** informed agents that there was a loaded handgun in the residence, then led agents to the location of a .40 caliber Glock in a bedroom and requested that agents remove it from the house. While in the bedroom, agents observed in plain view in excess of $200,000 in jewelry, including a diamond encrusted Jacobs watch and a diamond encrusted dog tag which was the size of a man's hand. **Lockett** initially consented to a search of the residence, but then revoked consent when agents attempted to confirm that she was in fact consenting to a search, before they actually searched the residence. Agents then searched the residence pursuant to a search warrant issued by the Honorable Aaron E. Goodtstein on March 3, 2006. In addition to the firearm seized late on March 2, agents found a Jacobs watch valued at approximately $100,000, two diamond encrusted necklaces valued at approximately $100,000, an additional $200,000 worth of jewelry, and $2,200 cash.

34.     Agents also went to 10892 W. Donna Court, the residence of Joy Thomas and **Larry Harvester**. Joy Thomas signed a written consent to search her residence. Agents located a Smith & Wesson 9 mm handgun, identification cards for **Kenyounta Harvester** and **Larry Harvester**, and approximately $28,900 in U.S. currency.

35.     Agents also went to 6018 N. 64th Street, apartment #8, is the residence of Karen Lemon and **Marquis Davis**. Karen Lemon gave written consent to search her residence. Inside, officers located a Black & Decker heat sealer, four boxes of sealable plastic bags, a .40 caliber handgun, a bullet proof vest, approximately one ounce of suspected marijuana, a digital scale with white residue, glass beakers with white residue, and a plastic bag with a white powdery substance.

10

36.     Agents further conducted a consent search at **Angela Bissonnette's** residence at 7029 W. Thurston, Milwaukee. This residence was not where **Bissonnette** was supposed to reside under the terms of her State probation. Agents seized six empty boxes for Glock firearms.

37.     Pursuant to a search warrant issued by the Honorable Aaron E. Goodtstein on March 3, 2006, agents searched **Nina Simmons'** residence at 6580 N. 73rd Street, Milwaukee. In the kitchen they found Black and Decker Food saver heat sealer; two rolls of plastic; four freezer bags; one unopened jar Inositol, which is a common cutting agent used to expand the volume of cocaine; one box of latex gloves; two roles of duct tape; and a plastic bag containing several kilogram wrappers. In the living room they found a loaded .40 Glock firearm, two identifiers for **Nina Simmons**, and two cellular telephones.

## D.     Evidence Obtained From the Wiretap

38.     Interception of telephone communications to and from one of Kenyounta Harvester's cellular telephones (the target telephone) began on January 31, 2006 and continued until March 2, 2006. During the monitoring of Harvester's cellular telephone, case agents conducted physical surveillance of Kenyounta Harvester and his associates, and placed a GPS tracker on one of Kenyounta Harvester's suspected drug delivery vehicles. The monitoring confirmed that Harvester was using his cellular telephone to coordinate his drug trafficking activities. What follows is a representative sample of the calls intercepted.

      a.     On February 1 at 6:31 p.m., **Harvester** received an incoming telephone call. After a brief social conversation, the unidentified male caller told **Kenyounta Harvester** he needed "one of thangs too." **Harvester** asked if the caller wanted "like a video (code for a kilogram of cocaine)?" Caller said, "Yup." **Harvester** then asked if the caller wanted a "whole video" (referring to a whole kilogram). The caller replied, "Nah, just like we started off doing" (referencing a prior transaction for cocaine). **Harvester** said it would take him 45 minutes.

      b.     On February 2 at 4:20 p.m., **Harvester** called Harry Glinberg Jewelers. **Harvester** spoke with Glinberg and discussed the purchase of a $20,000 watch for a friend. Glinberg described the watch as yellow gold, with sapphire crystal and eight round and two baguette diamonds. Glinberg said he would sell the watch to **Harvester** for $6,500.

      c.     On February 2 at 11:23 p.m., **Harvester** called an unidentified male and asked if he wanted to come get his "movies" (code for kilograms of cocaine). The unidentified male said, "Yeah, hell yeah." **Harvester** told the unidentified to meet him "by Skinny [**Marquis Davis**] girl's" house.

11

d.    On February 3 at 8:04 p.m., **Harvester** received a call from an unidentified male who asked if he can "get another one before the night is over with?" **Harvester** asked, "When are you ready?" The caller said he would be ready as soon as he goes to get the money, in about 30 minutes? **Harvester** said, "OK." This call follows a pattern seen in other calls where **Harvester** sets up an apparent drug transaction using the **target telephone**, and the deal is consummated either using another telephone, or in a meeting.

e.    On February 8 at 3:13 p.m., **Harvester** received a call from an unidentified male caller who discussed meeting at "Toya's" (referring to **Toya Olds**). **Harvester** said he is getting his "paperwork" together (a slang term for money used by **Harvester** and his associates). Subsequently, on February 9 at 5:22 p.m., **Harvester** called an Ohio area code number and spoke with an unknown female (at a named Dawn about a text message she sent to him earlier. **Harvester** chastised her for sending such a message to "this phone". He then talked about picking up some "DVDs" (code for kilograms of cocaine). **Harvester** then discussed whether the exchange would go down in a McDonald's parking lot and whether the money and the drugs would be exchanged the same day, or if there would have to be a second trip. **Harvester** then told her that he has a trustworthy guy to do this job. He told her to be careful about what she talks about on the telephone.

f.    On February 9 at 5:41p.m., **Harvester** called and spoke with an unknown female and related that he and his guys are always carrying guns. He added that he pays security to get guns inside clubs.

g.    On February 9 at 6:17 p.m., **Harvester** called and spoke with an unidentified female whom he advised that if she came up that week, he could get her some "movies" (code for kilograms of cocaine).

h.    On February 10 at 4:59 p.m., **Harvester** called Harry Glinberg Jewelers and spoke with Glinberg regarding a jewelry transaction between **Harvester's** brother and another person for $5,000. **Harvester** then asked about a Rolex watch, and Glinberg said the watch would appraise for $20,000 to $22,000, and that it had diamonds on the face. **Harvester** told Glinberg that he would pick it up later.

i.    On February 10 at 6:58 p.m., **Harvester** received a call from an unidentified male caller who asked when **Harvester** is going to be ready to see that "movie" (code for a kilogram of cocaine). **Harvester** said he would call the caller back.

12

j.  On February 15 at 1:59 p.m., **Harvester** received a call from **Angela Bissonnette**, who reported that she was going "to pay bills." Based upon **Bissonnette's** role in the organization, it is reasonable to assume she was going to pay expenses incurred by the organization for things such as apartment rentals.

k.  On February 15 at 4:34 p.m., **Harvester** called an unidentified male and asked if he was at the shop. The unidentified male stated he was, and **Harvester** told the male that he would call him in a few minutes, and asked if he wanted to check out the "movies" (code for kilograms of cocaine). The unidentified male said he was ready, but **Harvester** said he would call back because he was not ready yet.

l.  On February 15 at 5:19 p.m., the **target telephone** received a call from (262) 781-0806. An unidentified male and **Harvester** discussed when they were going to be "ready to move on" [code for doing a drug deal]. They made a 3-way call to another unidentified male. **Harvester** asked the second unidentified male if he was "ready." At 7:53 p.m., the **target telephone** received another call from (262) 781-0806. **Harvester** told the first unidentified male to have someone get money and then call **Harvester** back.

m.  On February 16 at 3:56 p.m., **Harvester** called **Derrick Bohannon**, a.k.a. Re-Roll, and discussed rental cars and "Skinny" (**Marquis Davis**), "Dreezy" (Nathaniel Johnson), "Buck" (**Calvin Hayes**), "Big Face", and "Superhead" going down to Houston. **Harvester** asked **Bohannon** if he still had "them girls I gave you and shit too?" **Bohannon** said, "Hell, yeah." Harvester then asked if "Marty" still has "all his girls and shit too." **Bohannon** said, "I don't know, man." **Harvester** then said, "'Cause last night, he only gave me, like a little bit of money on them motherfuckers and shit. . . .He just gave me a little bit of paper. He still had more than half of what the shit I had gave him, but like see it's really on y'all because the sooner y'all get rid of that shit, the faster I go back and get more of that shit. . . .It's really y'all; y'all got to move that shit quicker you gotta move that shit quicker than a n—-er. . . like I know the game and shit is coming up . . .but y'all gotta move that shit faster though." **Bohannon** then said, "Yeah, my shit go as soon as I. . .when I come back, mines gonna be gone goddammit, 'cause I gave that shit to a couple of motherfuckers who I fuck with. I ain't give it to them, but you know what I mean." The two then discussed jewelry and Harry Glinberg. They then discussed whether anyone else – mentioning "Sugar" and "Dreezy" – had "paper" (money) for **Harvester**.

n.  On February 17 at 12:49 p.m., **Harvester** received a call from an unidentified female caller who asked for "two splits" (common slang for 4 ½ ounce

13

quantities of cocaine). **Harvester** told her the price is "6000" (a price consistent with the request for two 4 ½ ounce quantities) and told her to get her money ready. **Harvester** said he was not interested unless they had the full 6000 because this is going to be a last minute deal before he left town. The caller said she would call the buyer back to see if they would be ready.

o.  On February 17 at 1:21 p.m., **Harvester** received a call from **Chantel Lockett** who advised that she paid a large amount of cash for two airline tickets in separate terminals (possibly $5,000). **Harvester** was upset because she did not charge it to a credit card, and was afraid the airline might call the police.

p.  From February 17 through February 21, 2006, **Harvester** was in Houston with numerous associates for the NBA All-Star game.

q.  On February 25 at 4:39 P.M., **Harvester** received a call from "Phyllis" who left a message on voicemail and asked if **Harvester** would make it on time to her residence, and if so, she wanted a "medium-sized" package (referring to a specific drug quantity).

r.  On February 25 at 4:53 P.M., **Harvester** received another call from "Phyllis" and **Harvester** told her that he was on his way to her house, and she replied that she didn't tell him what she wanted, but he must have figured it out. **Harvester** then interrupted her and told her not to talk about anything on his phone.

s.  On February 26 at 1:27 P.M., **Harvester** called "Phyllis" and asked if she "liked that," and Phyllis replied that it was "straight" (referring to the drugs being of good quality). **Harvester** then said that he had something much better than that.

## E.   Evidence Obtained From Cooperating Members of the Conspiracy

39.     The undisputed organizer and leader of the conspiracy was **Kenyounta Harvester**. The primary purpose of the conspiracy was to accumulate money and other assets through the distribution of large volumes of cocaine, cocaine base and marijuana to mid-level dealers operating primarily in Milwaukee and adjoining counties.

40.     As leader of the conspiracy, **Kenyounta Harvester** was responsible for establishing

14

sources of supply for large volumes of cocaine and marijuana, negotiating purchases and prices, and ensuring payment was made at the time of sale or soon thereafter if the purchase was made on a consignment basis. **Harvester** has been known to be involved in the trafficking of cocaine and cocaine base in the Milwaukee, Wisconsin area since the early 1990's.

41.    **Rafael Rodriguez** and **Raul Aguirre-Alvarado, a.k.a. Pedro Aguirre-Ramos**, first began to work with Harvester in early 2005, and served to transport cocaine from a source of supply in the Northern District of Illinois / Northern District of Indiana to Milwaukee, and returning with payment. The conspiracy was provided this cocaine on a consignment basis, and received between 8 and 20 kilograms two to three times a month.

42.    Once the cocaine was in Milwaukee, **Kenyounta Harvester** further coordinated and organized storage and distribution. **Kenyounta Harvester** utilized past and present girlfriends, including **Nina Simmons**, **Angela Bissonnette**, **Daidra Brown** and others, who rented and maintained residences used by the conspiracy to conceal and store drugs, proceeds, handguns and other assets acquired by the conspiracy. **Simmons** began her involvement with the **Harvester** conspiracy in approximately 2002, while **Bissonnette** had been working with **Harvester** since at least 1995. In addition, **Harvester** used **Simmons** and his wife, **Chantel Lockett**, who owned and rented vehicles used by the conspiracy to distribute cocaine and pick up payment.

43.    **Kenyounta Harvester** and others would often add cutting agents to the cocaine - a process referred to as "rerocking" - in order to expand the apparent volume of cocaine (although reducing its purity) to expand the conspiracy's profit margins.

44.    On an almost daily basis, as directed by **Kenyounta Harvester**, **Joseph Johnson** and **Marquis Davis**, who both began working actively for **Harvester** in approximately early 2005, would receive cocaine from **Kenyounta Harvester**, **Nina Simmons** and **Angela Bissonnette** and then travel around the City of Milwaukee and elsewhere to distribute the cocaine directly to customers, as well as to pick up payments. Many customers received cocaine on a consignment basis, so payment was made on a later date. **Kenyounta Harvester** then assembled the proceeds for payment to the conspiracy's sources of supply and paid other members of the conspiracy for their services. **Harvester's** younger brother, **Larry Harvester**, as well as **Nina Simmons**, **Angela Bissonnette**, **Marquis Davis**, **Joseph Johnson** and others often assisted **Harvester** in counting and packaging these proceeds for payment.

45.    Customers of the conspiracy included and received the following:

| | | |
|---|---|---|
| a | Eric Barksdale | well over 54 kilograms of cocaine |
| b. | Brandon Bennett | well over 10 kilograms of cocaine |
| c. | Dejuan Curry | well over 36 kilograms of cocaine |
| d. | **Derrick Bohannon** | well over 25 kilograms of cocaine |
| e. | **Terrill Crawford** | at least 20 kilograms of cocaine |
| f. | Gary Fletcher | well over 45 kilograms of cocaine |

15

| g. | **Michelle Mays** | well over 42 kilograms of cocaine |
| h. | Calvin Hayes | well over 60 kilograms of cocaine |
| i. | Glen Murphy | well over 10 kilograms of cocaine |
| j. | **Toya Olds** | well over 10 kilograms of cocaine |
| k. | Anthony Nelson | at least 20 kilograms of cocaine |
| l. | Lance Reed | at least 9 kilograms of cocaine |
| m. | Hiram Smith | at least 6 kilograms of cocaine |

46. **Larry Harvester, Nina Simmons, Angela Bissonnette, Joseph Johnson, Marquis Davis** and others also received cocaine from **Kenyounta Harvester** to sell to their own customers.

47. As directed by **Kenyounta Harvester**, many members of the conspiracy routinely carried firearms and employed force and threats of force to protect the conspiracy and collect payments. All members of the conspiracy were aware that many members carried firearms.

48. Members of the conspiracy routinely employed counter-surveillance and concealment tactics to disguise and protect their activities. Members also utilized cellular telephones, usually supplied by **Kenyounta Harvester**, and coded language while speaking on the phones to effectuate the goals of the conspiracy.

49. **Kenyounta Harvester** further paid for legal services for arrested conspirators in order to ensure their loyalty and to prevent them from cooperating with law enforcement.

50. The total volume of cocaine distributed by the conspiracy was well in excess of 150 kilograms with profits in the millions of dollars. As the leader of the conspiracy, **Kenyounta Harvester** kept the lion's share of the profits for his own use.

16